**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1026-15T2
              A-1027-15T4

BENEDICT FEJOKU,

    Plaintiff-Appellant,

v.

PRUDENTIAL LIFE INSURANCE
COMPANY OF AMERICA, INC.,
n/k/a PRUDENTIAL FINANCIAL,
INC., LEEDS, MORELLI & BROWN,
LLP,[1] LENARD LEEDS, STEVEN A.
MORELLI, JEFFREY K. BROWN,
and MARK FABER,

    Defendants-Respondents.

_____

LINDA GUYDEN,

    Plaintiff-Appellant/
    Cross-Respondent,

v.

LEEDS, MORELLI & BROWN LLP,
LENARD LEEDS, ESQ., STEVEN A.
MORELLI, ESQ., and JEFFREY K.
BROWN, ESQ.,

    Defendants-Respondents/
    Cross-Appellants.

_____

[1] According to the record, this defendant should be denominated
"Leeds, Morelli & Brown, P.C."

Argued April 9, 2018 — Decided June 11, 2018

Before Judges Sabatino, Ostrer and Rose.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Docket Nos. L-3393-10 (A-1026-15) and L-3571-10 (A-1027-15).

Kenneth S. Thyne argued the cause for appellant in A-1026-15 (Roper & Thyne, LLC, attorneys; Kenneth S. Thyne, on the briefs).

Angela M. Roper argued the cause for appellant/cross-respondent in A-1027-15 (Roper & Thyne, LLC, attorneys; Kenneth S. Thyne, on the briefs).

Evan H. Krinick (Rivkin Radler, LLP) of the New York bar, admitted pro hac vice, argued the cause for respondents Leeds, Morelli & Brown, PC, Lenard Leeds, Steven A. Morelli, and Jeffrey K. Brown in A-1026-15 (Rivkin Radler LLP, attorneys; John J. Robertelli and Janice J. DiGennaro, on the brief).

Janice J. DiGennaro (Rivkin Radler, LLP) of the New York bar, admitted pro hac vice, argued the cause for respondents/cross-appellants Leeds, Morelli & Brown, PC, Lenard Leeds, Steven A. Morelli, and Jeffrey K. Brown in A-1027-15 (Rivkin Radler LLP, attorneys; John J. Robertelli, Janice J. DiGennaro, and Michael C. Mulè, on the briefs).

David W. Field and Liza M. Velazquez (Paul, Weiss, Rifkind, Wharton & Garrison LLP) of the New York bar, admitted pro hac vice, argued the cause for respondents Prudential Life Insurance Company of America and Mark E. Faber in A-1026-15 (Lowenstein Sandler LLP and Liza M. Velazquez and Amy L. Barton (Paul, Weiss, Rifkind, Wharton & Garrison LLP) of the New

York bar, admitted pro hac vice, attorneys;
David W. Field, Liza M. Velazquez, and Amy L.
Barton, on the brief).

PER CURIAM

These related appeals[2] by two plaintiffs in this legal malpractice matter arise out of the broader setting of employment discrimination claims brought by them individually and by over 300 other employees against Prudential Life Insurance Company of America. Both plaintiffs ceased being represented by the law firm ("the Leeds firm") that had initially represented them, after learning the full details of a fee arrangement with Prudential that rewarded the law firm for steering its clients into alternative dispute resolution processes.

Ultimately, with the assistance of substitute counsel, and after moving in federal court to set aside an unfavorable arbitration ruling, plaintiff Linda Guyden obtained a monetary settlement from Prudential. Guyden then sued the Leeds firm and three of its partners in the Law Division, alleging various acts of malpractice and malfeasance. Plaintiff Benedict Fejoku, who procured no settlement or favorable outcome on his own discrimination claims, sued the Leeds firm on similar grounds, naming Prudential and others as co-defendants. The two lawsuits

---

[2] We consolidate these appeals solely for purposes of this opinion.

were administratively assigned to the same trial court vicinage, along with comparable lawsuits by other former Leeds clients.

In successive rulings, the trial court granted summary judgment to all defendants, dismissing the lawsuits of both Guyden and Fejoku. Fundamentally, the court concluded that, by discontinuing the services of their original law firm (Leeds) long before their cases had ended, plaintiffs extracted themselves from the sphere of any initial wrongdoing or malpractice, and thus could not demonstrate proximate causation of compensable injury. The court made other various rulings, some of which are challenged in the present appeals.

For the reasons that follow, we uphold the trial court's rulings, except we remand for further proceedings solely with respect to Guyden. On remand, the court shall develop the record definitively and resolve the critical factual question of whether Prudential, before settling, offered Guyden the opportunity to set aside the arbitration award and allow her to litigate her discrimination claims in court. If such an offer was never made, then the court's dispositive finding of a lack of sufficient proof of proximate causation as to Guyden was mistaken, and summary judgment shall be vacated in her case. If the court on remand finds there is a genuine factual dispute as to whether such an

A-1026-15T2

offer was extended, that factual question shall be resolved by a jury.

The summary judgment issued against Fejoku, however, is affirmed. We also uphold the trial court's other challenged rulings.

I.

In 1999, the Leeds firm entered into a written agreement with Prudential to attempt to have clients agree to take part in Alternative Dispute Resolution ("ADR") processes of mediation and arbitration, in lieu of litigating their claims in court.[3] Prudential agreed to pay the Leeds firm a non-refundable $5 million in counsel fees, consisting of a $3.5 million advance, with an additional $1.5 million to be paid to the firm by August 1999 or when the first one hundred claims settled. According to plaintiffs, the Leeds firm did not tell them contemporaneously the terms of this fee arrangement; they only knew Prudential would be paying the fees of their lawyers as part of the ADR process.

Guyden is an African-American certified public accountant who was hired by Prudential in September 1997. She eventually resigned in March 2001. She claims she was paid a lower salary, given a

---

[3] This agreement has already been described in this court's related published opinion in Lederman v. Prudential Life Ins. Co., 385 N.J. Super. 324, 334 (App. Div. 2006), which we incorporate by reference here.

lower bonus, and denied promotions three times because of her race, in comparison with non-minority employees who allegedly received better treatment.

Fejoku is a native of Nigeria who was hired as a staff accountant by Prudential in 1992. He claims he was denied promotions, harassed, and had to work in a hostile work environment due to his race.

Both Fejoku and Guyden, and many other claimants, met at Leeds' New York offices in May 1999 and signed an agreement which specified their claims would be pursued exclusively through an ADR process. Eventually the Leeds firm's representation of Guyden and Fejoku discontinued.

Guyden retained new counsel, who filed suit against Prudential in federal court. The matter was referred to arbitration pursuant to the ADR agreement. After several days of hearings, the arbitrator found Guyden had not proven discrimination. Guyden moved to set aside the arbitration result. Federal District Judge Katharine S. Hayden did not resolve the merits of the motion, but instead granted Guyden discovery concerning her claim that she had been fraudulently induced to sign the ADR agreement.

Thereafter, Guyden mediated with Prudential a settlement, the terms of which are confidential. Meanwhile, Fejoku opted not to

participate in the ADR process. He was terminated from his employment by Prudential and obtained no recovery.

Guyden and Fejoku filed legal malpractice cases against the Leeds firm and several of its partners, which were consolidated in the Law Division with those of similar claimants. Fejoku named Prudential as a co-defendant.

Among other things, plaintiffs contend: the Leeds firm had a conflict of interest; it improperly engaged in the practice of law in New Jersey without being admitted in this State; it wrongfully failed to disclose to them in a timely manner the details of the $5 million fee arrangement; and the fees should be disgorged as a wrongful payment made to induce a breach a fiduciary duty. They also challenge the allocation of legal fees charged by a Special Discovery Master whom the trial court appointed.

The trial court granted summary judgment and dismissed plaintiffs' claims largely for lack of causation, finding both Guyden and Fejoku had extricated themselves from the Leeds firm's initial representation and thereafter proceeded with their discrimination claims on their own. They contend those and other rulings against them were erroneous, and that their lawsuits should be reinstated. They also contest the court's approval of the fees paid to the Special Discovery Master, who is now deceased.

II.

We first address the dismissal of Guyden's claims. In doing so, we focus on the trial court's pivotal finding that Guyden extricated herself from the Leeds firm's initial representation and thus cannot prove that she proximately suffered any harm from its alleged breaches of duty. As we consider the issues posed on summary judgment, we view the record in a light most favorable to Guyden as the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); see also W.J.A. v. D.A., 210 N.J. 229, 238 (2012).

Although her complaint identifies several different legal theories, the gravamen of Guyden's lawsuit against the Leeds firm is an action for legal malpractice. To prevail on a legal malpractice claim, a plaintiff must establish the existence of an attorney-client relationship creating a duty of care by the attorney, breach of that duty, and proximate causation of damages. Jerista v. Murray, 185 N.J. 175, 190-91 (2005). A plaintiff must demonstrate proximate cause by showing his or her former counsel's negligent conduct was a "substantial contributing factor" in causing damages. Lamb v. Barbour, 188 N.J. Super. 6, 12 (App. Div. 1982).

Where, as here, a legal malpractice case arises out of alleged failures by a plaintiff's former litigation counsel, the plaintiff

8

must establish a likelihood of success of the so-called "case-within-a-case." Conklin v. Hannoch Weisman, 145 N.J. 395, 417 (1996). Specifically, plaintiffs here must show in their malpractice lawsuits that they would have prevailed, or otherwise obtained a favorable outcome in the cases that their former attorneys handled, had counsel not deviated from professional standards of care. Ibid.; see also Jerista, 185 N.J. at 191. So here Guyden must prove not only that lawyers at the Leeds firm breached their duties to her, but also that she would have obtained a larger recovery on her underlying discrimination claim against Prudential if those breaches had not occurred.[4]

Guyden alleges the Leeds firm breached its duties to her in several respects. Principally, she claims the law firm acted improperly in advising her to enter into the ADR agreement with Prudential without disclosing to her that it had a financial incentive under its fee arrangement with Prudential to steer its clients into ADR. Guyden claims the firm had a conflict of interest by virtue of the fee arrangement, which she characterized as a "commercial bribe" paid to induce the law firm's breach of fiduciary duty to clients. She further contends the firm deviated

---

[4] The amount of Guyden's settlement is confidential. Any verdict in her favor in the legal malpractice case would need to be molded accordingly to treat the settlement as an offset.

from the standards of care for lawyers who represent clients with employment discrimination claims, by advising her to give up her right to litigate those claims in court, where she would have had broader discovery, the right to a jury trial in a public forum, and the potential to recover punitive damages. She also asserts the Leeds firm, which is based in New York, engaged in the unauthorized practice of law in New Jersey without being admitted to practice here.

To support her contention of proximately-caused injury, Guyden tendered an expert report from a New Jersey attorney who frequently represents plaintiffs with employment discrimination and wrongful discharge claims. The expert opined that Guyden was placed at a substantial disadvantage by forfeiting her rights to litigate in court and limiting herself to the ADR process. The expert maintained that it is widely known that business employers generally prefer to keep employment cases out of court and to have such matters instead resolved in private binding arbitration and that, conversely, plaintiffs' lawyers resist doing so for legitimate tactical reasons. The expert supported Guyden's contention that she would have had more leverage against Prudential if her claims were litigated in court, and the opportunity to recover higher damages, including punitives, if she proved her claims before a jury.

A-1026-15T2

The expert calculated Guyden's total wage loss at over $800,000, which he opined would be potentially enhanced by a jury award in the range of $125,000 to $250,000 for "personal hardships." He estimated Guyden, if she proved Prudential's liability for employment discrimination, would be awarded total compensatory damages of approximately $1 million, plus or minus $150,000. In addition, the expert projected that Guyden would have recovered three to five times that sum in punitive damages, if she established the flagrancy of defendant's conduct as required by the Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17.[5]

In its April 8, 2015 oral decision, the trial court found Guyden's legal theories generally untenable. It rejected her premise that discrimination claimants are usually better off litigating their claims in court rather than in arbitration or other ADR processes.

The trial court also rejected Guyden's argument that damages must be presumed if she established that the Leeds firm had been tortiously induced to breach its fiduciary duties to her. The court noted that no New Jersey precedent has adopted such a "presumed damages" principle for such cases. The court declined

---

[5] Our discussion of these figures should not be construed as a finding they are reasonable or likely. We simply accept them for the sake of discussion, viewing the record in a light most favorable to Guyden.

to follow an opinion from another jurisdiction supporting such a theory in a case coincidentally involving the Leeds firm and a different fee arrangement.  See Johnson v. Nextel Commc'n Inc., 660 F.3d 131 (2d Cir. 2011).[6]  Moreover, the court noted the opinion in Nextel did not reach questions of proximate cause.

The court found that a genuine issue of material fact existed over whether the Leeds firm had allegedly engaged in the unauthorized practice of law in New Jersey, denying an earlier motion for partial summary judgment that the plaintiffs in the consolidated case had filed.  Moreover, the Rules of Professional Conduct have been construed to allow out-of-state attorneys to engage in ADR activity for New Jersey clients in certain circumstances.  See RPC 5.5(b)(3)(ii) and Opinion 43, 187 N.J.L.J. 123 (Jan. 8, 2007).

We concur with the trial court's rulings with respect to Guyden's claims seeking recovery based on the unauthorized

---

[6] The counsel fee arrangement in Nextel provided that the employer defendant would pay the Leeds firm counsel fees on a sliding scale, depending upon how quickly claimants represented by the firm settled, with an additional $2 million enhancement if all of them settled.  Id. at 140-43.  Here, although there are some similarities, the fees payable by Prudential to the Leeds firm involved no sliding scale and no ultimate fee enhancement tied to getting all of the clients with claims to settle.

A-1026-15T2

practice of law and seeking presumed damages from an induced breach of fiduciary duty. We need not embellish those rulings here.[7]

We respectfully differ with the trial court's "per se" premise that the standards of care of a lawyer representing clients in employment discrimination matters cannot include the viewpoint of Guyden's expert, i.e., that such lawyers should refrain from advising their clients to agree to binding arbitration or ADR and waive their rights to a jury trial. Although the court is right that statutes and case law generally favor such dispute resolution processes — where chosen with the mutual consent of the parties — it is not always in a litigant's best interests to submit to them and give up the procedural and substantive rights they have in court and the pretrial provisions of the Rules of Court. The right to a civil jury trial is enshrined in the United States Constitution and our State Constitution and continues to be a meaningful entitlement. U.S. Const. amend. VII; N.J. Const. art. I, § 9. The broad right of litigant access to pretrial discovery in our civil courts also generally surpasses the more limited

---

[7] As a side note, we do not adopt the court's application of "law of the case" principles in extending to Guyden a prior unpublished and unappealed opinion the trial court issued in dismissing the claims of another claimant. Defense counsel at oral argument on the appeal agreed that it would be inappropriate to bind Guyden and Fejoku to that unpublished opinion as "law of the case," although they think the court's reasoning was sound and logically applied to the present plaintiffs as well. See R. 1:36-3.

ability of parties to obtain facts and evidence within arbitration and other ADR processes.  See Capital Healthcare Sys. v. Horizon Healthcare Servs., 230 N.J. 73, 80 (2017).  Punitive damages recoverable in appropriate civil cases involving flagrant conduct are not ordinarily recoverable in arbitration.  The right to obtain plenary appellate review of a final judgment issued by a court contrasts with the far more limited grounds on which to set aside an arbitration award.  N.J.S.A. 2A:23B-1 to -32.

Given these many differences between civil litigation and ADR processes, it is not unreasonable, as Guyden's expert opines, for an attorney representing a claimant alleging she was the victim of discriminatory practices to favor and recommend litigating the matter in court instead of some other forum.  To be sure, at times ADR can be swifter and less costly than traditional litigation.  But reasonable persons can differ about the standards of care for attorneys who represent claimants of discrimination about the proper choice of forum.  The trial court erred on this discrete point.  The standards of care are fairly debatable.

That said, we now turn to what turns out to be the crux of the appeal:  proximate causation.  The trial court concluded that all of Guyden's claims should be dismissed because of one common flaw, i.e., her alleged failure to present adequate evidence that the initial representation by the Leeds firm caused her any

14

ultimate injury.  As we have already noted, the court reasoned that Guyden's discharge of the Leeds firm and her retention of different counsel, who handled her claims for many years thereafter to completion, broke the alleged chain of causation tied to any actual harm.  The court noted that an arbitrator had found her claims to lack merit, and it is therefore speculative to think her claims were worth any more than the sum her successor attorneys were able to negotiate in settlement with Prudential.

We generally agree with the trial court's analysis on this causation point, subject to one major caveat.  The caveat concerns whether, in fact, after Federal Judge Hayden authorized discovery to delve into the issue of fraudulent inducement, Prudential offered Guyden the opportunity to set aside the arbitration award and to litigate her claims in court.  The record is disputed and inconclusive on this key question.

Defendants present a certification from an attorney who had been involved in the federal matter, had represented Prudential, and recalls that he made such an offer orally during a telephone conference with counsel and a United States Magistrate.  The offer, if it was made at all, apparently was never memorialized in a confirmatory writing.  Nor was the telephone conference transcribed.  Guyden, meanwhile, denies she was ever told about such an alleged offer.

A-1026-15T2

There is clearly a genuine issue of material fact on this critical question, which makes summary judgment inappropriate. If, in fact, Prudential made such an offer to Guyden to, in effect, wipe out the arbitration and the ADR agreement and litigate her discrimination claims instead in court, and she or her then-counsel rejected that offer, then she cannot establish proximate causation. That scenario would signify that Guyden was not ultimately, as she alleges, "trapped" in arbitration, having declined an offer to exit that process. Her claims of injury would be untenable, under the well-established doctrine of "avoidable consequences." See Komlodi v. Picciano, 217 N.J. 387, 412 (2014).

Conversely, if Prudential never made such a definitive proposal, then Guyden's claims were prematurely dismissed on summary judgment. Proximate causation would be a proper question for the jury, viewing, as we must, the record in a light most favorable to the non-moving party. Although Guyden settled her case, she claims she did so under the unfavorable conditions — her ADR agreement — that the Leeds firm caused her to enter.

For these reasons, summary judgment for defendants in Guyden's case with respect to her legal malpractice claims must be vacated without prejudice, pending the development of the record on remand concerning Prudential's alleged offer. If conclusive

proof on that subject does not emerge, then the factual dispute must be resolved by a jury.

In sum, we affirm the trial court's disposition as to Guyden in part, and vacate and remand in part limited to the issues we have specified.

### III.

We turn to the summary judgment order dismissing Fejoku's claims. In doing so, we repeat and incorporate by reference what we have already said respecting Guyden's various claims.

There are two important differences between Fejoku and Guyden. First, as we will elaborate in more detail, *infra*, Fejoku, unlike Guyden, did not litigate his claims with new counsel after he was no longer a client of the Leeds firm. Second, unlike Guyden, Fejoku has no expert report quantifying any proximately-caused damages. These differences are critical shortcomings for Fejoku.

Here is the pertinent procedural history as to Fejoku. Like Guyden and others with discrimination claims against Prudential, Fejoku initially agreed to be represented by the Leeds firm and he signed the ADR agreement.

In February 2000, the Leeds firm sent a letter to Michael Young and Kathleen Roberts, arbitrators and mediators with JAMS Endispute ("JAMS"), describing class members' claims. In July

2000, claimants represented by the law firm began to present their claims to the mediators.

In early 2001, Fejoku participated in mediation with JAMS and demanded from Prudential a sum to settle his claim, but soon reduced his demand to $4 million plus a promotion. As of March 2001, he requested $500,000. Prudential counter-offered him $10,000 if he stayed at the company or $60,000 if he left. In June 2001, Prudential increased its offer to $75,000 if Fejoku would leave employment with the company.[8]

In September 2001, Prudential made a global settlement offer of $10.5 million to resolve all outstanding claims in the matters, but Fejoku opted to proceed to arbitration. By October 2001, Prudential and the Leeds firm agreed to the final global settlement terms.

On November 14, 2001, Fejoku told attorney Jeffrey K. Brown of the Leeds firm that he wanted a different arbitrator to handle his claim because JAMS had unsuccessfully mediated the matter. Another attorney at the Leeds firm, Deirdre Kamber Chisari ("Kamber"), responded that a JAMS arbitrator would be more sympathetic to Fejoku, having handled numerous other claims by

---

[8] The parties have not argued these figures are inappropriate to discuss here under N.J.R.E. 408.

other clients.  In any event, Kamber agreed to set up arbitration with the American Arbitration Association.

In November 2001, Fejoku appeared at a pre-arbitration conference with Kamber and JAMS arbitrator Young.  At the conference, Fejoku did not mention his request for a new arbitrator and instead agreed to attend arbitration on January 17 and 18, 2002.  That same day, Fejoku e-mailed Brown informing him that he had changed his mind about the arbitration dates.  The firm requested a changed date but Arbitrator Young denied it.

In January 2002, Fejoku told Kamber that he would not attend arbitration because the process was not, in his view, fair.  He further informed Kamber that he would not appear for arbitration because:  January 17 and 18, 2002 were inconvenient dates for him; he did not trust JAMS; the ADR agreement had expired; and he wished to file a lawsuit, not to submit to arbitration.  Kamber responded that the ADR agreement required him to participate in arbitration.

On January 17, 2002, Fejoku did not appear at arbitration and Arbitrator Young ordered him to appear January 25, 2002.  Fejoku then informed Prudential's counsel that he would not appear, but instead, would withdraw from the settlement process and seek "outside" counsel. On January 31, 2002, Arbitrator Young dismissed Fejoku's complaint without prejudice.  On February 6, 2002, the

A-1026-15T2

Leeds firm withdrew from representing Fejoku and informed him that he was free to arbitrate or go to trial if he wished.

Notably, Fejoku never retained any successor counsel to address his discrimination claims. He received no settlement from Prudential. In August 2008, Prudential terminated him.

In September 2011, Fejoku filed a pro se lawsuit (Docket No. ESX-L-7444-11) against Prudential for claims related to his August 2008 termination, but it was dismissed as time-barred. Fejoku filed an appeal but eventually withdrew it.

Meanwhile, Fejoku filed the present legal malpractice case against the Leeds firm, making allegations similar to those of Guyden.

In a comprehensive written decision dated July 7, 2014, the same motion judge who presided over Guyden's claims granted summary judgment to defendants in Fejoku's matter. A core aspect of the judge's analysis was Fejoku's failure to present viable proof of proximate causation or harm.

We affirm the trial court's grant of summary judgment in Fejoku's case, substantially for the reasons expressed in its written opinion, and subject to the few analytic caveats we have already noted in Part II solely with respect to Guyden.

The critical difference between Fejoku and Guyden is that the latter retained new counsel and endeavored to extract some recovery

from Prudential. Fejoku, by contrast, refused to participate in arbitration and declined to retain new counsel to protect his interests. He only belatedly tried to file a pro se complaint against Prudential when it was too late to do so.

In essence, Fejoku's losses, if any, are substantially self-inflicted. We discern no basis to reinstate his claims in the present case, even viewing the record in a light most favorable to him. We affirm the summary judgment order as to him.

IV.

The remaining issues raised on appeal, including the arguments concerning the late Special Discovery Master's approved fees and the trial court's decision to appoint such a master in this complex, multiparty litigation, do not have sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed in part and remanded in part as to Guyden; affirmed as to Fejoku. We do not retain jurisdiction in Guyden.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1026-15T2